```
IN THE UNITED STATES DISTRICT COURT
  FOR THE NORTHERN DISTRICT OF ALABAMA
            SOUTHERN DIVISION
```

PATRICIA GARRETT,             }
                              }
     Plaintiff,               }
                              }    CIVIL ACTION NO.
v.                            }
                              }    97-AR-0092-S
THE UNIVERSITY OF ALABAMA AT  }
BIRMINGHAM BOARD OF TRUSTEES, }
                              }
     Defendant,               }
                              }
     * * * * *                }
                              }
UNITED STATES OF AMERICA,     }
                              }
     Intervenor.              }

FILED 02 SEP -4 PM 3:25  U.S. DISTRICT COURT N.D. OF ALABAMA

ENTERED SEP 0 4 2002

## MEMORANDUM OPINION

The above-entitled case seems destined to stay in the courts a while longer. It will probably show up again on the calendar of the Supreme Court of the United States unless the Court heads it off by granting the petition for certiorari filed by the State of Hawaii on June 20, 2002, seeking a review of the Ninth Circuit's decision in *Vinson v. Thomas*, 288 F. 3d 1145 (9th Cir. 2002). *Vinson* presents the same question presented in this case.

Patricia Garrett ("Garrett") filed her original complaint on January 14, 1997, alleging that while employed by the University of Alabama at Birmingham Board of Trustees ("UAB"), she was discriminated against because of her breast cancer. She invoked both the Americans with Disabilities Act, 42 U.S.C. §§ 12102, et seq. ("ADA"), and § 504 of the Rehabilitation Act of 1973, 29



U.S.C. § 794 ("Rehab Act"). UAB's first line of defense was its interposition of the Eleventh Amendment as an absolute bar both to the ADA claim and to the Rehab Act claim. Garrett quickly and correctly pointed out that when Congress enacted these discrimination statutes it had in mind the enforcement of the Equal Protection Clause of the Fourteenth Amendment, a permitted way under certain circumstances for overriding a State's Eleventh Amendment immunity. This court disagreed with Garrett, finding that hers were not the circumstances for such a Congressional override. *Garrett v. Bd. of Trustees of the U. of Ala.*, 989 F. Supp. 1409 (N.D. Ala. 1998). This court did not address Garrett's alternatively suggested way around the Eleventh Amendment as to her Rehab Act claim, namely, Congress's redundant invocation of the Spending Clause of the Constitution, Art. I § 8, Cl. 1. Garrett's present argument for enforcing the Rehab Act against a state agency such as UAB in a federal court is premised on two statutes. They must be considered separately and severally. The first is:

> No otherwise qualified individual with a disability in the United States, as defined in section 706(20) [Congress meant § 705(20)] of this title shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination **under any program or activity receiving Federal financial assistance** . . .

29 U.S.C. § 794(a). (emphasis supplied).

The second is:

> A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in

2

> Federal court for a violation of section 504 of the Rehabilitation Act of 1973 [29 U.S.C. § 794] . . . or the provisions of any other federal statute prohibiting discrimination by recipients of Federal financial assistance.

42 U.S.C. § 2000d-7(a)(1).

Garrett's original complaint did not allege that any of the conduct plaintiff complains of occurred "under any program or activity receiving Federal financial assistance." Perhaps Garrett did not think she needed to allege the transparently obvious. Neither did she allege that UAB had waived its Eleventh Amendment immunity with respect to her separate Rehab Act claim by Alabama's having accepted any money from the United States. Again, perhaps Garrett thought it superfluous to allege the obvious.

Although the Rehab Act provided Garrett an alternative to the ADA for pursuing a disability claim against her employer, when this case was last before this court the entire focus was on her ADA claim, as to which Congress had relied exclusively on the Equal Protection Clause for the express and unequivocal abrogation of Eleventh Amendment protection for a State. Without this court's saying a word on the right of Congress to employ the Spending Clause as a Constitutional basis for authorizing a private action against a state agency in the Rehab Act, this court granted summary judgment in favor of UAB, dismissing all of Garrett's claims, including her Rehab Act claim. *Garrett*, 989 F. Supp. 1409. Earlier, the court had dismissed with prejudice Garrett's claim for

3

punitive damages under the Rehab Act, and accompanied its order of dismissal with a finding of finality under Rule 54(b), F.R.Civ.P. Garrett did not appeal from that order. However, when summary judgment was granted against her on all of her remaining claims, she did appeal to the Eleventh Circuit. She was, of course, required to appeal from all adverse dispositive rulings about which she wished to complain.

Because in 1999 the Eleventh Circuit disagreed with this court with respect to the right of Congress under the Equal Protection Clause to abrogate Eleventh Amendment immunity both as to ADA claims and Rehab Act claims, the Eleventh Circuit did not speak to the viability of Garrett's claim under the Rehab Act under an alleged Spending Clause justification for circumventing the Eleventh Amendment. Neither did the Eleventh Circuit mention the absence of an allegation by Garrett in her complaint that UAB had received federal funds and by doing so had waived its Eleventh Amendment immunity. *Garrett v. Univ. of Ala. at Birmingham Bd. Trs.*, 193 F. 3d 1214 (11th Cir. 1999).

During Garrett's appeal to the Eleventh Circuit, the United States of America intervened on her behalf. After the Eleventh Circuit ruled for Garrett, UAB petitioned for certiorari, and the Supreme Court took the case. After many *amici curiae* briefs were filed, the Supreme Court in a 5-4 decision, disagreed with Garrett, disagreed with the United States, disagreed with the Eleventh

4

Circuit, agreed with UAB, agreed with this court, and held that Congress had no right under the Equal Protection Clause to wipe out a State's insulation from private actions brought under the ADA. The Supreme Court never mentioned, and apparently was not asked to look at, the question of UAB's possible vulnerability because of the Congressional invocation of the Spending Clause in the Rehab Act. *Board of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 121 S. Ct. 955 (2001).

Pursuant to the mandate it received from the Supreme Court, the Eleventh Circuit affirmed this court, both as to Garrett's ADA claim and as to her Rehab Act claim. But, upon Garrett's application for rehearing, the Eleventh Circuit reconsidered and held that the Eleventh Amendment issue had not been procedurally barred, and was an open question. It quoted UAB's brief on application for rehearing as follows:

> The district court's order and opinion which opened the way for the original appeal of this case did not address the possibility that the plaintiffs' Rehabilitation Act claims might, or might not, be the source of jurisdiction via a waiver of state immunity. It simply was not analyzed or discussed; frankly, none of the parties presented much in the way of argument on the issue of waiver. In view of these circumstances, **the best course would be for this Court to remand in order to allow the district court to analyze the issue and, if it deems appropriate, to develop an evidentiary record**.

(emphasis supplied). *Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.*, 276 F. 3d 1227, 1228 (11th Cir. 2002).

5

Because of this strange concession by UAB, the Eleventh Circuit remanded the case to this court with the specific instruction "to consider the argument that defendants [at that time there were consolidated cases involving two separate state agencies] have voluntarily waived their Eleventh Amendment immunity under § 504 of the Rehabilitation Act by their receipt of federal financial assistance conditioned upon such a waiver, and to conduct such further proceedings as may be consistent with this decision." *Id.*, 1229.

After this court received the above-quoted mandate from the Eleventh Circuit, Garrett and the United States were allowed to explore what UAB could not deny, namely, that UAB, and all other State agencies in Alabama, have received federal financial assistance. Unremarkably, UAB filed a motion for summary judgment.

In defense of UAB's motion for summary judgment, Garrett not only relies on waiver by virtue of UAB's and Alabama's having pocketed federal dollars, but she has tried to introduce an alternative argument for waiver based on UAB's litigation conduct. The court respectfully declines to consider Garrett's latter argument. It goes beyond what was contemplated by the Eleventh Circuit, and the court is not tempted at this late date to expand the inquiry beyond the necessary.

There was actually no need for discovery, or to "develop an evidentiary record." It would have been a futile and expensive

enterprise. It quickly became obvious that the only remaining issue is purely a question of law, because the only pertinent fact is undisputed. That fact is that UAB, like every other major institution of higher learning in the United States, has received many federal dollars, both before and after the Rehab Act was enacted. The degree to which the decision-makers at UAB, or any other State agency, actually deliberated over whether to continue to accept federal dollars after the Rehab Act was enacted is unknown. What the governing body of UAB, with or without the help of its lawyers, would have done if they had carefully studied the Rehab Act when it was signed by the President and came off the Government press, is highly speculative. The court guesses that UAB could not have weaned itself from federal dollars, even if, philosophically, it had wanted to. As recently as last week, that great private institution, Harvard University, decided to allow military recruiters back on campus when the only alternative was to lose over $300,000,000 in federal funding. Did Harvard act "voluntarily," or did it act "under duress?" Oppression arises when there is severe inequality in bargaining power. The result of such an imbalance is an absence of meaningful choice, and no real negotiation. Agreements arrived at under such circumstances are often unconscionable. Does the law of contracts apply to the United States?

This court will reluctantly assume *arguendo* that UAB knowingly

7

accepted federal dollars, fully understanding that by doing so it was exposing itself to the possibility that it could be sued under the Rehab Act. This is not a valid assumption if the rationale of the Second Circuit in *Garcia v. S.U.N.Y. Health Sciences Center*, 280 F. 3d 98 (2d Cir. 2001), is accepted. In *Garcia*, the Second Circuit held:

> Because § 504 of the Rehabilitation Act and Title II of the ADA offer essentially the same protections for people with disabilities, *see Randolph v. Rodgers*, 170 F. 3d 850, 858 (8th Cir. 1999), our conclusion that Title II of the ADA as a whole exceeds Congress's authority under § 5 of the Fourteenth Amendment applies with equal force to § 504 of the Rehabilitation Act. However, unlike Title II of the ADA, § 504 was enacted pursuant to Congress's authority under the Spending Clause of Article I. *See* U.S. Const. art. I, § 8, cl. 1.
>
> When providing funds from the federal purse, Congress may require as a condition of accepting those funds that a state agree to waive its sovereign immunity from suit in federal court. *See College Savings Bank*, 527 U.S. at 686-87, 119 S.Ct. 2219; *see also South Dakota v. Dole*, 483 U.S. 203, 207, 107 S. Ct. 2793, 97 L. Ed. 2d 171 (1987). Here, Garcia argues that § 2000d-7 of Title 42 operates as such a condition. Section 2000d-7 provides in pertinent part that,
>
>> [a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal Court for a violation of Section 504 of the Rehabilitation Act of 1973.
>
> While we agree with Garcia that this provision constitutes a clear expression of Congress's intent to condition acceptance of federal funds on a state's waiver of its Eleventh Amendment immunity, that conclusion alone is not sufficient for us to find that New York actually waived its sovereign immunity in accepting federal funds for SUNY. *But see Jim C. v. United States*, 235 F.3d 1079, 1082 (8th Cir. 2000) (en banc). As the Supreme Court instructed in *College Savings Bank*.

8

> [t]here is a fundamental difference between a State's expressing unequivocally that it waives its immunity and Congress's expressing unequivocally its intention that if the State takes certain action [e.g., accepting federal funds] it shall be deemed to have waived that immunity.

*College Savings Bank*, 527 U.S. at 680-81, 119 S. Ct. 2219. As is the case with the waiver of any constitutional right, an effective waiver of sovereign immunity requires an "intentional relinquishment or abandonment of a *known* right or privilege." *Id.* at 682, 119 S. Ct. 2219 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938) (emphasis added); *See also College Savings Bank*, 527 U.S. at 682, 119 S. Ct. 2219 ("State sovereign immunity, no less than the right to trial by jury in criminal cases, is constitutionally protected."); *see also McGinty v. New York*; 251 F. 3d 84, 95 (2d Cir. 2001) (noting "stringent" standard for finding waiver of state sovereign immunity). And in assessing whether a state has made a knowing and intentional waiver, the Supreme Court has instructed that "every reasonable presumption against waiver" is to be indulged, *College Savings Bank*, 527 U.S. at 682, 119 S. Ct. 2219 (internal quotation marks omitted).

Turning to the instant case, we are unable to conclude that New York in fact waived its sovereign immunity against suit under § 504 when it accepted federal funds for SUNY. At the time that New York accepted the conditioned funds, Title II of the ADA was reasonably understood to abrogate New York's sovereign immunity under Congress's Commerce Clause authority. Indeed, the ADA expressly provided that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation . . . ." 42 U.S.C. § 12202. Since, as we have noted, the proscriptions of Title II and § 504 are virtually identical, a state accepting conditioned federal funds could not have understood that in doing so it was actually abandoning its sovereign immunity from private damages suits, *College Savings Bank*, 527 U.S. at 682, 119 S. Ct. 2219, since by all reasonable appearances state sovereign immunity had already been lost, *see Kilcullen*, 205 F. 3d at 82.

> Accordingly, Garcia's § 504 damage claim against New York fails because New York had not knowingly waived its sovereign immunity from suit.

*Id.* at 113-15.

The United States, as intervenor, understandably disagrees with the Second Circuit. This court finds *Garcia* well reasoned and persuasive.

Another approach was taken by the Fifth Circuit in *Reickenbacker v. Foster*, 274 F. 3d 974 (5th Cir. 2001). The Fifth Circuit held:

> Congress may abrogate state sovereign immunity when it "both unequivocally intends to do so and 'act[s] pursuant to a valid grant of constitutional authority.'" The ADA and Rehabilitation Act indisputably contain unequivocal statements of intent to abrogate. **It is now settled that Congress may not act to abrogate state sovereign immunity through any of its Article I enumerated powers**, but may abrogate state sovereign immunity through a proper exercise of its powers under § 5 of the Fourteenth Amendment. As a result, States may only be sued under the ADA and Rehabilitation Acts to the extent that those statutes, inasmuch as they are directed at unconstitutional discrimination by the States, are appropriate exercises of the § 5 power.

*Id.* at 977. (emphasis supplied).

Thus, according to the Fifth Circuit, Congress cannot use the Spending Clause to abrogate a State's immunity, the Spending Clause being in Article I. It is perhaps because of *Reickenbacker* (although that case is not mentioned by UAB) that Garrett disclaims any intent to argue "abrogation," and only argues "waiver." To this court the distinction is without a difference. Garrett says that while the Spending Clause may not entitle Congress to

10

"abrogate," Congress can take away all federal funds unless a State "waives" its immunity from suit. Because UAB is part of a university system and shares the trustees who govern the University of Alabama at Tuscaloosa, a federal dollar arriving at Tuscaloosa would be just as destructive of Eleventh Amendment immunity as a dollar received at Birmingham, that is, if the Rehab Act accomplishes what Garrett says it does. UAB's decision-makers, if they knew nothing else, knew that the Rehab Act purported to abrogate Eleventh Amendment immunity **under the Equal Protection Clause**. The fact that the Eleventh Circuit knew the Congressional intent under the Equal Protection Clause convinces this court that UAB was on the same page as the Second Circuit in *Garcia* and the Fifth Circuit in *Reickenbacker*. You cannot voluntarily waive something you have unequivocally been told you do not have.

On June 10, 2002, the very day that UAB submitted its brief in support of its post-mandate motion for summary judgment, the Ninth Circuit decided *Vinson*, reaffirming its earlier holding that "states are subject to suit in federal court under section 504 of the Rehabilitation Act funds." 288 F. 3d 1145, 1151. Why the Ninth Circuit limited the reach of the Rehab Act to state agencies that receive "Rehabilitation Act funds" is beyond this court's comprehension. Section 504 of the Rehab Act (42 U.S.C. § 794), purports to expose state agencies to suit by any and every person who is **"subjected to discrimination under any program or activity**

11

**receiving Federal financial assistance."** There is nothing in this language that limits the source or purpose of the "federal financial assistance" that would open the federal courthouse door to a plaintiff against a State. In any event, this court disagrees with the majority in *Vinson*. Instead, this court agrees with the dissent of Judge O'Scannlain, as well as with Judge O'Scannlain's dissent from the denial of hearing *en banc* in *Douglas v. Cal. Dep't of Youth Auth.*, 285 F. 3d 1226 (9th Cir. 2002). The court will not quote or repeat to the point of plagiarism what Judge O'Scannlain so well said in his dissents in *Vinson* and in *Douglas*. Suffice it to say that he logically reached the conclusion that the Spending Clause cannot operate as a device for circumventing a State's Eleventh Amendment immunity at the whim of Congress. The traditional presumption against a waiver, reinforced by the Supreme Court's opinion in *Garrett*, this very case, precludes a successful Congressional override of the Eleventh Amendment in disability discrimination cases.

On June 17, 2002, one week after *Vinson* was decided, the Supreme Court decided *Barnes v. Gorman*, ____ U.S. ____, 122 S. Ct. 2097 (2002). If Judge O'Scannlain had had *Barnes* to work with, he might have been writing the majority opinion in *Vinson*. In *Barnes*, the Supreme Court dealt specifically with § 504 of the Rehab Act, although not with the Eleventh Amendment. The Court was there dealing with the efficacy of a litigant's reliance on the reference

12

in the Rehab Act to the Spending Clause as a justification for seeking punitive damages. Speaking for the Court, Justice Scalia said:

> Title VI invokes Congress's power under the Spending Clause, U.S. Const., Art. I, § 8, cl. 1, to place conditions on the grant of federal funds. See *Davis v. Monroe County Bd. of Ed.*, 526 U.S. 629, 640, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999) (Title IX). **We have repeatedly characterized this statute and other Spending Clause legislation as "much in the nature of a *contract* in return for federal funds, the [recipients] agree to comply with federally imposed conditions."** *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17, 101 S. Ct. 1531, 67 L. Ed. 2d 694 (1981) (emphasis added); see also *Davis, supra*, at 640, 119 S. Ct. 1661; *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 286, 118 S. Ct. 1989, 141 L. Ed. 2d 277, (1998); *Guardians Assn. v. Civil Serv. Comm'n of New York City*, 463 U.S. 582, 599, 103 S. Ct. 3221, 77 L. Ed. 2d 866 (1983) (opinion of White, J.); *id.*, at 632-633, 103 S. Ct. 3221 (Marshall, J., dissenting); *Lau v. Nichols*, 414 U.S. 563, 568-569, 94 S. Ct. 786, 39 L. Ed. 2d 1, (1974). **Just as a valid contract requires offer and acceptance of its terms, "[t]he legitimacy of Congress' power to legislate under the spending power . . . rests on whether the [recipient] voluntarily and knowingly accepts the terms of the 'contract.' . . . Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously."** *Pennhurst, supra*, at 17, 101 S. Ct. 1531.

\* \* \*

> **Some authorities say that reasonably implied contractual terms are those that the parties would have agreed to if they had adverted to the matters in question. See 2 Farnsworth, *supra*, § 7.16 at 335, and authorities cited. More recent commentary suggests that reasonably implied contractual terms are simply those that "compor[t] with community standards of fairness," Restatement (Second) of Contracts § 204, Comment d.**

\* \* \*

13

> **And for the same reason of unusual and disproportionate exposure, it can hardly be said that community standards of fairness support such an implication. In sum, it must be concluded that Title VI funding recipients have not, merely by accepting funds, implicitly consented to liability for punitive damages**.

(emphasis supplied). *Barnes*, 122 S. Ct. 2097, 2100-02.

The court keeps in mind that Garrett in her original complaint sued UAB under the Rehab Act for punitive damages. *Barnes* would have eliminated Garrett's punitive damages claim if this court had not already done so. But, the rationale of *Barnes* goes farther than simply to protect a state agency from punitive damages. As a matter of law, the purported waiver terms set forth in § 504 of the Rehab Act do not "comport with community standards of fairness," to use Justice Scalia's phrase. The concept of waiver in the Rehab Act may be fair in the view of some, but in this court's view, it does not meet community standards of fairness.

Lastly, the ambiguity in § 504 stands in the way of a successful waiver. Whether Congress could "unambiguously" impose a waiver of Eleventh Amendment immunity as a condition to a particular federal grant is a question that is not before the court, because Congress in § 504 did not limit the proscriptions of the Rehab Act to State agencies; and it said nothing in the Rehab Act to make it absolutely clear to State agencies that if they continued to accept federal dollars, they would waive their Eleventh Amendment immunity, and the immunity of every other of

14

their fellow State entities. It is theoretically possible that some agency could find a way to get along without a single federal dollar, but to succeed in using withdrawal as a club, the threat must be fully comprehensible. The Rehab Act's threat is hard to get a handle on, particularly when the emphasis was always on the Equal Protection justification. This may explain why nobody tried to get a handle on it sooner in this case.

### Conclusion

It is true, as the Eleventh Circuit says, that the Supreme Court in *Garrett* did not address the question of the Spending Clause's effect on the Rehab Act's application to UAB. This court thinks, however, that *Garrett* either implicitly ruled on it or obliquely predicted the outcome, and that any remaining doubt evaporated when *Barnes* was decided. *Barnes* strongly suggests that the Supreme Court will not allow Garrett to travel a secondary route to get where she could not go in a frontal assault, even with the United States of America at her side. The United States may be even more interested in this case this time around than it was last time, because it probably does not want to lose the Spending Clause as an instrument of persuasion. If the Supreme Court finds that Congress can do what it has tried to do in the Rehab Act as a back-up means of obtaining compliance, the use of the Spending Clause will expand exponentially.

A separate order granting UAB's motion for summary judgment will be entered.

DONE this 4th day of September, 2002.

                                                      WILLIAM M. ACKER, JR.
                                                     UNITED STATES DISTRICT JUDGE